# UNITED STATES  DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**JOHN L. BUNIFF**                                      **CIVIL ACTION**

**versus**                                                    **NO. 07-1779**

**BURL CAIN, WARDEN**                          **SECTION: "B" (6)**

## <u>REPORT AND RECOMMENDATION</u>

This matter was remanded to the district court by the U.S. Fifth Circuit Court of Appeals, *see* Rec. Doc. 27, and referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts, for the purpose of considering the merits of petitioner, John Buniff's claims. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. §

2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED**

that the petition be **DENIED WITH PREJUDICE**.

## PROCEDURAL BACKGROUND

Petitioner, John L. Buniff, is a state prisoner incarcerated at the Louisiana

State Penitentiary, Angola, Louisiana.  On September 25, 2000, he was convicted of

second-degree murder in violation of Louisiana law.[2]  On December 14, 2000, he was

sentenced to a term of life imprisonment without benefit of parole, probation, or

suspension of sentence.[3]  On December 30, 2002, the Louisiana Fifth Circuit Court

of Appeal affirmed his conviction.[4]  The Louisiana Supreme Court denied his related

---

[1]  Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

[2]  State Rec., Vol. VI of VIII, transcript of September 25, 2000, p. 182; State Rec., Vol. I of VIII, minute entry dated September 25, 2000; State Rec., Vol. I of VIII, jury verdict form.

[3]  State Rec., Vol. II of VIII, transcript of December 14, 2000; State Rec., Vol. I of VIII, minute entry dated December 14, 2000.

[4]  *State v. Buniff,* No. 02-KA-0567 (La. App. 5th Cir. Dec. 30, 2002) (unpublished); State Rec., Vol. I of VIII.

writ application on May 9, 2003, thus making his state conviction final.[5]

On May 7, 2004, petitioner, through counsel, filed with the state district court an application for post-conviction relief.[6]  That application was denied August 10, 2004, without an evidentiary hearing.[7]  The Louisiana Fifth Circuit Court of Appeal subsequently granted petitioner's related writ application and remanded the matter for an evidentiary hearing.[8]  Petitioner then filed a supplemental post-conviction application on February 28, 2005,[9] and an evidentiary hearing was held on May 2, 2005.[10] The state district court thereafter again denied relief on November 28, 2005,[11] and petitioner's related writ applications were denied by the Louisiana Fifth

---

[5] *State v. Buniff*, 843 So.2d 396 (La. 2003) (No. 2003-K-0298); State Rec., Vol. I of VIII.  He thereafter filed an application for reconsideration which the court also denied on June 27, 2003. *State v. Buniff*, 847 So.2d 1257 (La. 2003) (No. 2003-K-0298); State Rec., Vol. I of VIII.

[6] State Rec., Vol. II of VIII.

[7] State Rec., Vol. II of VIII, Order dated August 10, 2004.

[8] *State v. Buniff*, No. 04-KH-1124 (La. App 5th Cir. Nov. 4, 2004) (unpublished); State Rec., Vol. II of VIII.

[9] State Rec., Vol. II of VIII.

[10] State Rec., Vol. III of VIII, transcript of May 2, 2005.

[11] State Rec., Vol. III of VIII, Order dated November 28, 2005.

Circuit Court of Appeal on March 24, 2006,[12] and the Louisiana Supreme Court on November 22, 2006.[13]

On April 12, 2007, petitioner, through counsel, filed the instant federal application for *habeas corpus* relief claiming that he received ineffective assistance of counsel.  Specifically, petitioner, through counsel, argues that his trial counsel failed to prepare for trial, including failing to meeting with him or to subpoena exculpatory witnesses; failed to object to privileged communications that were introduced to the jury; failed to redact those privileged communications before the jury; and, failed to argue the responsive verdict of manslaughter. A Report and Recommendation was issued by the undersigned, recommending that the petition be dismissed with prejudice for being untimely filed.[14] The Report and Recommendation was adopted after objections were overruled[15] and petitioner appealed.  The U.S. Fifth Circuit remanded the case, noting that a decision rendered by that Court in *Wilson v. Cain*, 564 F.3d 702, 706 (5th Cir. 2009), after the district court decided the instant

---

[12]   *State v. Buniff*, No. 06-KH-64 (La. App. 5th Cir. Mar. 24, 2006) (unpublished); State Rec., Vol. III of VIII.

[13]   *State v. Buniff*, 942 So.2d 546 (La. 2006) (No. 2006-KP-0936); State Rec., Vol. II of VIII.

[14]Fed. Doc. 12.

[15]Fed. Doc. 17.

case, altered the time-bar analysis to be employed.  Therefore, the Fifth Circuit vacated the district court's judgment and remanded the matter for consideration.  The State was then ordered to and did file a "Supplemental Response in Opposition to Granting Writ of Habeas Corpus" (Rec. Doc. 34).  Each of petitioner's claims will be addressed, in turn.

STATEMENT OF FACTS[16]

The following facts are derived from the unpublished opinion of the Louisiana Fifth Circuit Court of Appeal on direct review of the petitioner's conviction:

> On September 24, 1999, at approximately midnight, a shooting occurred at 1908 Faith Place in Terrytown and was reported in a 911 call. Jefferson Parish Sheriff's Deputy David Heintz arrived to find a black male, later identified as Lentini Porche, lying on the ground, bleeding from an apparent gunshot wound to the chest. Paramedics transported the victim to Meadowcrest Hospital for treatment and he later died from his injuries.
>
> Deputy Heintz first spoke with Dione Brown, an eyewitness to the shooting and the victim's girlfriend. This conversation led the officer to the alleged assailant, John Buniff. Buniff told the officer that there had been a fight and that he had shot Lentini Porche. The officer advised Buniff of his rights, placed him under arrest and searched

---

[16]The facts are adopted from the state appellate opinion in *State v. Buniff*, 02-567 (La.App. 5 Cir. 12/30/02), 837 So.2d 769 (unpublished decision), after a review of the record.

him. During the search, shotgun shells were found in the assailant's back pocket. The officer asked Buniff about the location of the murder weapon and Buniff advised him that it was in the living room on the coffee table. Officer Heinz found a .9mm Kel Tech handgun and separate magazine at that location. A second weapon, a shotgun, and shotgun shells were also found in the apartment. A spent .9mm casing was found at the scene. These items were taken into evidence.

The Dodge pick-up owned by Ms. Porche, found at the crime scene, was searched by consent. The white Pontiac rental vehicle, formerly driven by the victim, was impounded and searched. No evidence, including weapons, was found in either vehicle.

Sergeant Dennis Thornton, of the Jefferson Parish Sheriff's Office, was able to locate two eyewitnesses to the shooting: Dione Brown, the victim's girlfriend and Delores Porche, the victim's mother. Statements were taken from each. Sergeant Thornton was present during the time when Buniff gave a statement concerning the shooting. Buniff was advised of his rights, he was photographed for identification and gave a statement to the officers, wherein he suggested that he had acted in self-defense. Buniff indicated that there was a second weapon that was earlier used by the victim against him. According to Buniff, Porche had punched him in the face before Buniff shot him. Buniff told the officers that Porche hid behind a wall, but Buniff's gun had already fired. Buniff further stated that Porche had killed someone in the past.

Sometime after this investigation, but before trial, Sergeant Thornton received a phone call from the defendant's mother, Amelia Darcey, who advised that she had some additional information and she wanted to surrender it to the

officer. Sergeant Thornton met with her and she gave him a .38 caliber handgun with ammunition, which she allegedly found in a locked shed at her son's house.

Although Buniff admitted to the shooting, the facts developed at the trial indicate a conflict in the events leading to the shooting. Timothy Freicht, a friend of the victim, went with Porche and Ms. Brown to see Buniff at his apartment. As Buniff and the victim were talking, they began to argue because Porche had paid for a two-day car rental and Buniff wanted the vehicle returned the same day. Freicht testified that both men were loud, yelling and arguing. Buniff was reportedly upset. The victim, according to Freicht, made no threats and took no aggressive action, however. He also stated that the victim did not have a gun or other weapon on him at that time. Freicht testified that Buniff pulled a .9mm handgun and pointed it at Freicht and Porche. Freicht said they were able to convince Buniff not to shoot them because they assured him they would go to Porche's mother's house and pick up the car and return it. According to this witness, following the initial confrontation, Porche left the scene in a rage. He and Ms. Brown remained with the defendant and Ms. Brown tried to calm Buniff. Buniff called the police who responded to the call. When the police arrived, Buniff did not tell them of any threats, that he was concerned for his life or that someone was trying to shoot him. According to this witness, Buniff merely told the police that everything was fine. The police left and, shortly thereafter, Porche returned and picked up Freicht and Ms. Brown. No threats were made at this time. Porche did not return with a gun.

Freicht testified that he, Ms. Brown, and Porche drove to Porche's mother's house. Freicht stated that Porche's mother told him she would follow her son to return the rental car to Buniff. Freicht did not go back to Buniff's

house, but stated that he took a ride with Porche's brother. He testified that he learned in a telephone conversation that Lentini Porche had been shot and was taken to the hospital.

Dione Brown, the victim's girlfriend was the only eyewitness to the two encounters between Porche and Buniff. Ms. Brown stated that on September 24, 1999, her boyfriend, Lentini Porche, and Timothy Freicht picked her up and the trio drove to her apartment where they stayed for a little while. Porche received two calls on his beeper and he returned the calls. According to Ms. Brown, she later discovered, from talking to Porche, that the pages were from John Buniff and Buniff wanted the return of the rental car that was being driven by Porche. Porche indicated he would not return the vehicle without a refund of the rental fee he had paid. Ms. Brown rode with Porche and Freicht to the defendant's apartment, in order for Porche to find out why Buniff wanted the car returned.

Upon arriving at the apartment and before exiting the vehicle, Buniff appeared "from nowhere" and he was very upset, cursing and in a rage, according to Ms. Brown. Ms. Brown also stated that her boyfriend, Porche, was sitting in the car laughing. She did not hear him threaten Buniff nor see him move toward Buniff aggressively. Ms. Brown stated that Porche was standing in front of Buniff, when Buniff pulled out a gun. She remembers the victim asking Buniff if he was going to shoot him and Buniff replied, "I'll shoot you if I have to." The victim said for Buniff to return his money and then he would return the car. Ms. Brown told her boyfriend, "let's go." Ms. Brown testified that she did not hear a disagreement.

Ms. Brown also testified that she, Porche, and Freicht left and drove to Porche's mother's house and upon their arrival she remained in the car. She stated that on the way home, they had left Freicht out at a gas station. Ms. Brown

testified that Buniff had called the victim's mother before their arrival and told her he felt Porche[17] was coming back to try to get in the defendant's house.

Porche returned from inside his mother's house, entered the rental car, and drove himself and his girlfriend to Buniff's apartment, as his mother followed in her Dodge pickup truck. Once at Buniff's apartment, Porche asked his girlfriend to knock on the defendant's door to let him know they were there. As she did so, Buniff was spotted outside. Porche and Ms. Brown were engaged in conversation and Porche had already returned the car keys, when Ms. Brown heard a "pop" and saw her boyfriend fall to the ground. Ms. Brown stated that she did not see the gun. Thereafter, Ms. Brown called for assistance. Ms. Brown also stated that she saw the victim's mother struggling with Buniff to keep him away from her son. Porche's mother, according to Ms. Brown, asked the defendant "What did you do?" Buniff replied, according to Ms. Brown, "That M. F. hit me." "Did you see him hit me?" Ms. Brown further testified, that just before the shooting she did not see Porche do anything to the defendant, nor did she hear a disagreement. She also stated that Porche did not have a weapon.

Delores Porche, the victim's mother, was also an eyewitness to the murder. She testified that her son had never been convicted of a crime. She further testified that prior to the date of the shooting her son told her he was paying defendant $30 per day for the rental of the car he was driving. Mrs. Porche testified that Buniff called on the day of the shooting and he was looking for her son. Buniff had told her he wanted the car returned because he needed

---

[17]The statement of facts from the appellate court indicates that Buniff had called the victim's mother and told her he felt *Buniff* was coming back to try to get in his house. The testimony of Ms. Brown actually indicates that it was Lentini who Buniff believed would try to get back into Buniff's house. See Trial Transcript dated September 21, 2000 at p. 62, State Rec., Vol. V of VIII.

a ride. Mrs. Porche indicated the defendant was not angry. She also testified that when her son arrived home on September 24, 1999, she told him they were going to bring the car back. Her son cleaned out the car and she followed him, in her truck, to Buniff's apartment. Her son told his girlfriend to go to Buniff's door and let him know that they brought the car back. Buniff walked up "from nowhere" according to this witness. Mrs. Porche stated that her son told Buniff "you messed over me" and "I paid you for the car."

According to Mrs. Porche, Buniff stated that he would pay Porche back and then pulled a gun and shot him in the chest. Her son fell to the ground and was bleeding. She struggled with Buniff to keep him from shooting her son again.

Buniff testified that the shooting was in response to threats and aggressive actions taken by the victim towards him. In particular, Buniff testified that prior to September 24, 1999, he wrecked his car and rented a car from Enterprise. Porche was a friend of Buniff, and he needed a car to transport his girlfriend from work. Porche agreed to pay the defendant to rent the vehicle the defendant had procured from Enterprise, because Buniff no longer needed the vehicle. The two men had previously gone to the rental agency together and Porche paid the rental amount for the extension of the lease. Buniff testified that he told Porche the car had to be returned by Wednesday, but the rental agency would extend the lease until the next Monday, if $80 was paid. Buniff stated that he and Porche again went to the rental agency to extend the lease, but Porche only had $40, but Porche agreed to bring in $40 more.

Buniff stated that on Sunday he beeped Porche and told Porche that $40 was due on the vehicle. According to Buniff, Porche advised that he was coming to Buniff's

house in 20 minutes. Buniff thereafter received a telephone call from Porche, who wanted to know why the car had to be returned, since the $40 rental had been paid. Buniff told him the reason was that $40 was still owed and the car could be reported stolen. Porche then told Buniff that he would not return the vehicle because his girlfriend needed a ride to work. Buniff told Porche if the vehicle were to be reported stolen, Porche would be arrested. According to the defendant, Porche then "threatened to break his legs," "beat him up" and "kill him." Buniff testified that Porche refused to return the vehicle unless his money was returned to him, and then, Porche hung up the phone.

Buniff stated that he next received a call from Dione Brown, who proposed that the vehicle remain at her house overnight and be returned in the morning. According to Buniff, Ms. Brown told him she was afraid of what her boyfriend would do. She told him she would come with Porche in the morning to return the vehicle.

Buniff further testified that on the day he expected to see Porche, Buniff waited outside his home, as a precaution. Buniff said Porche demanded his money and goaded Buniff to pull his (Buniff's) gun. Buniff stated that after this incident, Porche jumped into his car and left Ms. Brown and Freicht behind. Buniff further stated that he was going to call the police. He told Ms. Brown that if Porche returned, Buniff "may have to shoot through his apartment door." The police arrived and Buniff made up a story and told them there was nothing wrong. Buniff testified that he was going to call Porche's mother, but Porche returned. Buniff stated that Porche hid behind a wall and pulled a gun, pointing it at him and Ms. Brown. Buniff also stated that he called Mrs. Porche and told her that her son had pulled a gun on him and threatened his life. According to Buniff, Mrs. Porche told him she was going to come with her son to return the rental car.

Buniff stated that Porche drove up again and went into the trunk of the rental vehicle. It was at this time, according to Buniff, Porche retrieved a gun. Mrs. Porche arrived shortly thereafter. She told Buniff that her son was upset about returning the car. Buniff testified that Porche walked over to hand his mother the keys to the rental car and as he did this, he punched Buniff in the head. Buniff testified that when this happened, Buniff pulled a gun from his pocket and the "gun goes off" striking Porche. Thereafter, Buniff testified, he put the gun in his pocket and called 911.

<u>STANDARD OF REVIEW</u>

This habeas proceeding is subject to the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, because Buniff filed his federal petition on April 12, 2007, well after AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 335–36 (1997). "Under AEDPA, if a state court has adjudicated a habeas petitioner's claims on the merits, he may receive relief in the federal courts only where the state court decision 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Rivera v. Quarterman*, 505 F.3d 349, 356 (5th Cir. 2007) (quoting 28 U.S.C. § 2254(d)).

"A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts." *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (citing *Williams v. Taylor*, 529 U.S. 362, 404–08, 120 S. Ct. 1495 (2000)). To merit habeas relief, a state habeas court's application of federal law must be not only incorrect but "objectively unreasonable." *Renico v. Lett*, –U.S. –, 130 S. Ct. 1855, 1865, 176 L.Ed.2d 678 (2010). A state court's factual findings are "presumed to be correct," although a habeas petitioner may rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### Denial of Right to Effective Assistance of Counsel

Petitioner claims that he was denied the effective representation of counsel, contrary to the Sixth Amendment. The seminal U.S. Supreme Court case for adjudicating a habeas petitioner's ineffective assistance of counsel claim is *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish ineffective assistance of counsel under *Strickland*, Buniff must show (1) defense counsel's performance was deficient and (2) this deficient performance prejudiced the defense. To grant relief, the court must find that trial counsel "made

– 13 –

errors so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." *Id*. The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case. *Id.* at 688. While "[j]udicial scrutiny of counsel's performance must be highly deferential," Buniff can demonstrate deficient performance if he shows "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. However, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *United States v. Webster*, 392 F.3d 787, 793 (5th Cir.2004) (quoting *Strickland*, 466 U.S. at 689). *Strickland*'s "prejudice" prong requires a reasonable probability that, but for the deficient performance of his trial counsel, the outcome of the trial would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

*Claim 1: Failure to conduct reasonable pretrial investigation and adequately prepare for trial*

Petitioner first complains that his trial attorney, Davidson Ehle, failed to prepare for trial, including meeting with petitioner or subpoenaing exculpatory witnesses.  Petitioner states that, following the shooting, several potential witnesses were outside. He claims that he provided his lawyers with the names of witnesses that

saw the altercation between him and the victim. Specifically, petitioner claims to have provided these witness's names to Attorney Kevin Boshea, his first assigned lawyer, then to Attorney Jim Williams, an attorney who began representing petitioner and was employed by the same firm as petitioner's trial attorney, Mr. Davidson Ehle.[18] Ehle, it is alleged, failed to investigate the witnesses identified by Buniff prior to trial.

Petitioner's ineffective assistance claims were addressed during the state post-conviction process, after an evidentiary hearing was held by the trial court on May 2, 2005. The trial court found that petitioner had, in fact, met with his client, had rendered effective assistance and that most of petitioner's objections to his attorney's performance attacked trial strategy employed by the lawyer rather than deficient performance. Post-conviction relief was thus denied by the trial court.[19] The appellate court reviewed this decision and similarly found that counsel was not ineffective. Specifically, addressing the failure to adequately investigate and locate witnesses aspect of the ineffective assistance claim, the Louisiana Court of Appeal, Fifth Circuit, found that petitioner failed to show how he was prejudiced by the alleged lack of preparation nor did petitioner establish that a more favorable result at trial would have

---

[18]Fed. Rec. Doc. 1, Petition at p.6-7.

[19]See State Rec., Vol. VIII of VIII for a copy of the trial court's November 28, 2005 decision.

occurred had counsel been better prepared and/or located additional witnesses.[20]  The Louisiana Supreme Court denied petitioner's application for supervisory writs arising out of this decision with one word: "Denied".[21]

Review of the evidentiary hearing transcript shows that one witness testified:  Attorney Davidson Ehle, who had served as petitioner's trial counsel. Ehle was an experienced lawyer at the time he represented petitioner on the second-degree murder charge, primarily in the area of criminal defense.[22]  Ehle explained that he acquired petitioner's case from Attorney Jim Williams approximately one week prior to trial.[23]  Ehle requested a continuance of the trial date but the motion was denied by the trial court.[24]  Petitioner's trial was held on September 19th, 21st and 25th, 2000. Ehle visited with petitioner for several hours at the Jefferson Parish Correctional Center on September 20, 2000, as well as for less than an hour on September 22,

---

[20]State Rec., Vol. III of VIII for a copy of the Louisiana Court of Appeal, Fifth Circuit's March 24, 2006 decision denying post-conviction relief.

[21]State Rec., Vol. VIII of VIII, for a copy of the decision in *State v. Buniff*, 942 So.2d 546 (La. 11/22/06)(Writ No. 2006-KP-0936).

[22]State Rec., Vol. VIII of VIII, Evidentiary Hearing Transcript (hereinafter EHT) at p.6.

[23]EHT at p. 7.

[24]EHT at pp. 15-16

2000.[25] He also testified that he talked with Buniff one time when Buniff was brought to court for a sanity hearing.[26]  Ehle also testisfed that Attorney Williams had earlier hired a private investigator, Steve Halbert, to track down witnesses to support petitioner's self-defense strategy. No eye witnesses were mentioned in the police report, Ehle recalled, nor did any ever materialize.[27] Ehle did not know if the investigator had ever visited Buniff in prison and prison log entries showed only that the investigator visited a few months after trial.[28] According to Ehle, the defense strategy was self-defense and petitioner's wife, Mary Hulbert was expected to testify at trial on petitioner's behalf. Ehle recalled hearing that Ms. Hulbert had difficulty reaching the investigator on the case. He also explained that when he learned Ms. Hulbert had delivered (damaging) letters to the sheriff's office, he felt that was a "big tipoff" that she was not going to be a favorable defense witness.[29] He also stated that petitioner's wife had just had a medical procedure performed and was on pain

---

[25]EHT at pp. 7-8.

[26]EHT at p. 35. The sanity hearing was held on September 19, 2000, the day trial began.

[27]EHT at pp. 10-11, 34.  The court notes that the responding police officer, Sergeant Thornton, testified that the known eye witnesses were the victim's mother, Dolores Porche, and the victim's fiancé, Ms. Dione Brown. (Trial Transcript of Sept. 21, 2000 at p.87, State Rec. Vol. V of VIII.)

[28]EHT at pp. 10-11.

[29]EHT at pp. 11, 35-36.

medication the day of the shooting of Porche so she could not remember a lot of that day.[30] Ehle also explained that he and Buniff had spoken at length about whether Buniff would testify at trial. Buniff "insisted upon testifying" even though he was advised that his prior conviction for possession of crack cocaine would be revealed to the jury.[31]

In his counseled brief, Buniff argues before this court that his attorney should have located witnesses, "including friends and neighbors from across the street"; i.e., John and Lisa Russell, Alicia Ruiz and Myra Kindernecht, who all allegedly would have testified about Porche's trips to and from the house on the day of the crime as well as would have attested to petitioner's expressed fear that Porche would hurt him.[32]  To this day, however, no such testimony has been given by these potential witnesses nor was an affidavit summary of the testimony they would offer submitted either to the state courts or to this court. In order to prevail, Buniff would have to show that the witnesses would have provided helpful testimony.  As a general rule, "'[c]omplaints of uncalled witnesses are not favored, because the presentation

---

[30]EHT at p. 32.

[31]EHT at pp. 19,  36-37.

[32]Fed. Rec. Doc. 1 at p. 8.

– 18 –

of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'" *Graves v. Cockrell*, 351 F.3d 143, 156 (5th Cir. 2003) (*quoting Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)).  In order for a petitioner to show prejudice under *Strickland*, he must demonstrate that the testimony of the witnesses would have been favorable and that the witnesses would have testified at trial.  *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).  Thus, where the only evidence of an uncalled witness's testimony comes from the defendant, federal courts are reluctant to find ineffective assistance on habeas review.  *Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir.1985).  Buniff has failed to show a serious error of his trial counsel in failing to call these witnesses nor has he submitted anything to support the substance of their expected testimony.  He has presented nothing but his own self-serving allegation that counsel should have done more to make the self-defense strategy more successful.

Moreover, his complaint regarding counsel's failure to meet with him prior to trial is not supported by a showing of prejudice.  The failure to meet with one's client prior to trial does not automatically make "the likelihood that counsel [can perform] as an effective adversary ... so remote as to [make] the trial inherently unfair."*United States v. Cronic*, 466 U.S. 648, 661, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).  Ehle's

testimony at the evidentiary hearing was that he met with his client twice during the course of trial as well as one time on the first day of trial at a sanity hearing. Petitioner fails to show that counsel's representation was in any way rendered deficient as a result of information he did not know due to his failure to meet with his client earlier.

Buniff also argues that counsel was less than effective in his representation because petitioner's wife, Mary Hulbert, was not properly utilized as a defense witness. Petitioner complains that prior counsel, Jim Williams, was unavailable when Ms. Hulbert attempted to contact him about her husband's case. Ms. Hulbert subsequently contacted the Jefferson Parish District Attorney's office and testified for the state at trial.   Although most of Buniff's complaints regarding witness, Mary Hulbert , center on the spousal communications between them, to the extent he is arguing that Ms. Hulbert could have provided favorable information to the defense, if contacted, he is clearly in error. Mary Hulbert testified at trial that she had no memory or recall of what happened the afternoon of September 24th, 1999.  Ms. Hubert recalled that she was "very, very ill" and that she had just been released from the hospital about a week before. She agreed with the prosecutor's characterization that she was "out of it".[33] Ms. Hulbert was recovering from pneumonia, kidney failure,

---

[33]State Rec. Vol. V of VIII, Trial Transcript at p. 148, hereinafter TT at p. __..

liver failure, minor infections and emphysema. She was also taking pain medication and was in a lot of pain, unable to focus on anything going around her.[34] In sum, as Ms. Hulbert testified, she would not have been able to remember anything which would have been beneficial to petitioner.  Therefore, Buniff cannot establish any prejudice under *Strickland* for his lawyer's failure to meet with her and/or use her as a defense witness.

Additionally, counsel strategically chose not to call Ms. Hulbert after learning that she had turned over letters that were damaging to petitioner's case to the District Attorney.[35] Ehle testified at the evidentiary hearing that he felt that was a "big tipoff" that she was not going to be a favorable defense witness.[36] There's a strong presumption on habeas review that such strategic decisions made by counsel are not attributable to ineffective assistance. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. "In any ineffectiveness case, a particular decision not to  investigate must be directly assessed for reasonableness in all the  circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 104 S.Ct.

---

[34]TT at pp. 148-49.

[35]EHT at pp. 11, 35-36.

[36]EHT at pp. 11, 35-36.

at 2066.  As the U.S. Fifth Circuit has instructed, "In the trial of lawsuits, as in war, victory finds a thousand fathers, defeat is an orphan. It is always possible to conjecture that defense counsel could have done more – conducted more investigation, called more witnesses, or engaged in more cross-examination – and that these additional efforts might have altered the result."  *Kirkpatrick v. Butler*, 870 F.2d 276, 285 (5th Cir. 1989)(citation omitted). Counsel's conduct, however, is not reviewed under such a standard. A claim of ineffective assistance lies only when counsel's performance was "outside the wide range of professionally competent assistance." *Id.*  Petitioner's claim that counsel was ill-prepared for trial, failed to investigate his case and failed to summon beneficial witnesses falls far short of *Strickland's* burden of proof for a claim of ineffective assistance.

*Claim 2: Failure to object to the introduction of privileged,*
*confidential communication*

*Claim 3: Failure to redact or edit the letters presented to the jury*

Petitioner argues, in claims 2 and 3, that his attorney was ineffective in failing to object to the admission of approximately 16 letters written by petitioner to his wife, Mary Hulbert. Petitioner argues that counsel should have filed a motion *in limine* or even an emergency writ, requesting exclusion of the letters on the basis of spousal

privilege under Louisiana Code of Evidence 504(B). Petitioner also argues that counsel should have redacted certain prejudicial and damaging information from these letters prior to the letters being admitted into evidence. The respondent argues that the state courts properly resolved this claim against petitioner in accordance with U.S. Supreme Court precedent.

The issue of ineffective assistance of counsel for failing to have the letters excluded was addressed in post-conviction proceedings before the state courts. Specifically, the Louisiana Court of Appeal, correctly applying *Strickland*, stated as follows, in pertinent part:

> The defendant's claim of ineffectiveness and prejudice relate primarily to the admission at trial of letters that he wrote to his wife while in jail pending trial.  In the letters, it appears that he was attempting to encourage his wife to remember and testify to facts surrounding the shooting that would support his claim of self defense, or that he shot the victim to protect himself, his wife and his property. In the letters, there was also reference to other crimes evidence and racial slurs that were not redacted before the letters were admitted at trial. . . .
>
> While there is some question as to whether trial counsel's performance in failing to adequately assert the Defendant's spousal   confidential   communication   privilege   was

deficient[37], we find that even if the objection had been sustained and the letters had not been admitted, the Defendant has not shown that the outcome of the trial would have been different. There were two eyewitnesses who testified at trial concerning the circumstances of the shooting. The Defendant does not deny that he shot the victim. His defense was that the shooting was in self defense. One witness testified that the victim did not have a weapon when he met with the Defendant and that he did not do anything to the Defendant before the shooting. She stated that she did not even hear a disagreement between the victim and the Defendant. After the shooting, she saw the victim's mother struggling with the Defendant to keep him away from her son. The victim's mother testified that the Defendant pulled out a gun and shot her son in the chest and that she had to struggle with him to keep him from shooting her son again.

---

[37]The Louisiana Court of Appeal, Fifth Circuit, was apparently referencing its earlier decision on direct appeal when Buniff directly attacked the trial court's ruling in admitting the confidential communications between Buniff and his wife pursuant to La. Code of Evidence art. 504(B). The appellate court found at that time that counsel only lodged a general objection to the confidential communications and had objected to the other crimes evidence being introduced as well as to the untimely disclosure of the letters. *See State v. Buniff*, 02-567 (La.App. 5 Cir. 12/30/02), 837 So.2d 769 (unpublished decision). Insofar as petitioner challenges the correctness of the state court's evidentiary ruling before this court, it has been uniformly held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). It is well-established that alleged trial court errors in the application of state procedure or evidentiary law, particularly regarding the admissibility of evidence, are generally not cognizable as grounds for federal habeas relief. *Id.* A state court's evidentiary ruling only presents a cognizable federal habeas claim if the ruling results in a "denial of fundamental fairness" *See Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998). The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction. *Wood v. Quarterman*, 503 F.3d 408 (5th Cir. 2007); *Neal*, 141 F.3d at 214. See also *Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").

*State v. Buniff*, Writ 06-KH-64 (La. App. 5 Cir. 03/24/06)(unpublished opinion) at p. 3, a

copy of which can be found in State Rec. Vol. III of VIII.

The question before this court, therefore,  is whether petitioner would have had a more favorable outcome at trial but for the admission of the letters to his wife into evidence. If the answer is yes, then petitioner would establish the necessary prejudice under *Strickland* for ineffective assistance to be proven.[38]  After a review of the full trial record, this court is convinced that a more favorable outcome at trial was unlikely.  First, there were two eyewitnesses to this crime and both testified that Buniff was not provoked by the victim, there was no fight or hostility between Buniff and the victim prior to the shooting, and that Buniff was the aggressor.[39] Another witness testified that, earlier the day of the shooting, Buniff had been the aggressor in a disagreement with the victim and had pulled a gun on the victim.[40] Moreover, as noted by the Louisiana Fifth Circuit on direct appeal, additional evidence was offered

---

[38]Although this court may have ruled differently than the state appellate court on direct appeal as to whether counsel's conduct was deficient when lodging his objections, such an determination is beyond the province of this court. Rather, this court assumes, *arguendo*, that counsel's conduct was deficient for purposes of applying a *Strickland* analysis.

[39]State Rec. Vol. V of VIII, Trial Transcript, Testimony of Dione Brown at pp. 50-53; 64; State Rec. Vol. VI of VIII, Testimony of Delores Porche at pp.12-14.

[40]State Rec. Vol. V of VIII, Trial Transcript, Testimony of Timothy Feicht, p. 12, 15.

which did not support Buniff's claim of self-defense.  "Although Buniff admitted he called the police, he never reported the alleged threats, or the victim's alleged assault with a firearm. The search of the area, the victim and his car failed to turn up a weapon allegedly used by the victim. The .38 caliber handgun, alleged found by the defendant's mother in a "locked" storage shed after the murder, and admitted into evidence, tested negative for fingerprints."[41]

With regard to counsel's failure to redact or "sanitize" the letters prior to their admission, the testimony of Ehle at the post-conviction evidentiary hearing makes clear that he intended to exclude all the information contained in the letters from the jury and that he thought his continued objections were sufficient to protect the record. He claimed that he continuously voiced his strenuous objection to the admission of the letters.[42]  Although Ehle could not recall many specifics, he testified that he did not believe allowing the other crimes (specifically drug crimes) evidence to remain in the letters was harmful to his client since Buniff insisted on taking the stand and his prior conviction would be revealed to the jury anyway.[43]  Also, useful evidence was

---

[41]*State v. Buniff,* No. 02-KA-0567 (La. App. 5th Cir. Dec. 30, 2002) at p. 11 (unpublished); State Rec., Vol. I of VIII.

[42]State Rec. Vol. III of VIII or VIII of VIII, EHT at pp. 13, 15, 38.

[43]EHT at p. 18-19.

included in the admission as information about the victim's three prior charges for assault and battery were contained in the letters which may have bolstered the self-defense strategy. Ehle was uncertain, however, if such a strategy was considered at the time.[44]  Ehle was, however, certain that he would not have wanted a racial slur to be contained in the letters shown to the jury although it was not redacted.[45]

In light of the other evidence offered at trial, including eyewitness testimony and the fact that only Buniff's self-serving testimony supported a claim of self-defense, counsel's failure to get the letters excluded from evidence or to redact some of the prejudicial evidence contained within those letters, cannot be said to have affected the outcome of trial.  Accordingly, this court does not find that the opinion of the state appellate court addressing petitioner's claim of ineffectiveness based upon admission of the letters is contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'resulted in a decision that was based on an unreasonable determination of

---

[44]EHT at p. 21. Ehle indicated at the hearing that he had wanted to review documentation prior to the evidentiary hearing so that he might recall what he had considered while representing Buniff but Buniff's lawyer for the evidentiary hearing, Ms. Kris Moe, would not provide him with any documentation. See EHT at p. 25 and 28-29.

[45]EHT at p. 21.

the facts in light of the evidence presented in the State court proceeding.'" *Rivera*, 505 F.3d at 356;  28 U.S.C. § 2254(d)). This claim is without merit.

*Claim 4: Failure to Argue the Responsive Verdict of Manslaughter*

Petitioner's final claim of ineffective assistance is a claim that counsel failed to argue the alternative defense of manslaughter, thus limiting the jury to a consideration of second degree murder, a charge which carries a mandatory life sentence. The State correctly argues that this claim was procedurally defaulted as it was never exhausted in the state courts. Before seeking a federal writ of *habeas corpus*, a state prisoner must first exhaust his available state remedies, thereby giving the state courts the opportunity to pass upon and correct the alleged violations of his rights.  To provide the state courts with that necessary opportunity, the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review).  28 U.S.C. § 2254(b)(1); *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004).  A total exhaustion rule promotes comity and such a rule does not unreasonably impair a prisoner's right to relief.  *Rose v. Lundy*, 455 U.S. 509, 522, 102 S. Ct. 1198, 1205, 71 L.Ed.2d 379 (1982). Generally, the exhaustion requirement is satisfied only when the grounds urged in a federal petition were previously presented to the state's highest court in a

procedurally proper manner.  *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). See also, *Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003), citing *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir.1997),  *Picard v. Connor,* 404 U.S. 270, 275-76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (To satisfy the exhaustion requirement, "a habeas petitioner must have fairly   presented the substance of his claim to the state courts." Failure to exhaust may be considered a state procedural default which may only  be excused through a showing of cause and prejudice or fundamental miscarriage of justice.  See, *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) ("A procedural default also occurs when a prisoner fails to exhaust available state remedies and  'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred'," citing *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991)). r

Review of petitioner's writ applications to the highest state court reveals that a claim of ineffective assistance based upon failure to argue for a manslaughter verdict was not included.[46] Therefore, petitioner has defaulted this claim and must show

---

[46]State Rec. Vol. VIII of VIII, Tab 19 for a copy of the post-conviction writ submitted. Petitioner also did not take the issue up on direct appeal.

"cause" and "prejudice" for his default or a fundamental miscarriage of justice.  See, *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). Petitioner makes neither showing.

Furthermore, even if the merits of this claim were addressed, petitioner still would not obtain relief. The copies of the closing arguments are not included in the record for this matter thus the court cannot definitely state that no such argument was advanced by defense counsel.  However, assuming that counsel did not argue to the jury that a manslaughter verdict might be appropriate, this court does not find any prejudice from the lack of such an argument.  First, it may, in fact, have been reasonable trial strategy on counsel's part to believe the evidence would not be sufficient to establish second degree murder. If second degree was not proven, Buniff would have to have been acquitted rather than allow the jury to reach a compromise verdict of manslaughter. Second, the record contains evidence that establishes that the jury was, in fact,  given the opportunity to reach a compromise verdict as the verdict sheet contained the lesser included offense of manslaughter[47] and the judge instructed the jury on the charge of manslaughter.[48] Counsel's failure to argue for a verdict of

---

[47]See State Rec. Vol. IV of VIII, p. 66.

[48]State Rec. Vol. I of VIII, See Jury Instructions on lesser included charge of manslaughter.

manslaughter, therefore, at best would be trial strategy and, at its worst, would be harmless error in light of the judge's instructions. Additionally, evidence that the murder occurred during "sudden passion or heat of blood immediately caused by provocation", as required for a verdict of manslaughter under La. R.S. 14:31, was lacking at trial. Counsel's failure to argue for the responsive verdict of manslaughter, therefore, is not deficient nor can prejudice under *Strickland* be established. Petitioner's final claim is also without merit.

## <u>RECOMMENDATION</u>

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by John L. Buniff be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.

*Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[49]

New Orleans, Louisiana, this _____17th_____ day of December, 2010.

<u>_____</u>
**LOUIS MOORE, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[49]*Douglas* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.